**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**FEB 29 2000**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

VICTOR SHANE KIISTER,

Defendant - Appellant.

No. 99-3042

(D. Kansas)

(D.C. No. CR-97-40036-02)

---

**ORDER AND JUDGMENT** *

---

Before **HENRY** , **ANDERSON** , and **LUCERO** , Circuit Judges.

---

Victor Shane Kiister was convicted by a jury of conspiracy to possess with

the intent to distribute methamphetamine, in violation of 21 U.S.C. § 846, and

possession with intent to distribute methamphetamine, in violation of 21 U.S.C.

§ 841(a)(1), and was sentenced to 151 months imprisonment. [1] Kiister appeals his

---

*This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

[1]Kiister's sentence in this case was ordered to run concurrently with his sentence imposed in a separate district court conviction, United States v. Kiister,

(continued...)

conviction on three grounds, alleging that (1) the district court erred in denying his motion to suppress items seized in a search of his property, as the affidavit used to obtain the search warrants relied on stale information and omitted other information that would have vitiated probable cause; (2) there was insufficient evidence to support his conspiracy conviction; and (3) the trial court improperly admitted evidence of his previous bad acts. For the reasons stated below, we affirm.

**BACKGROUND**

On April 29, 1997, Kiister was arrested near the home of John Autem for possession of approximately one pound of methamphetamine. A police videotape shows that after Kiister and Autem entered the outbuilding near Autem's home, Autem indicated that a small package on the table was for him. Kiister lifted his shirt, stuck the package down his pants, and left the building. Detective Sergeant Tim Holsinger testified that when police officers who were stationed at the scene approached Kiister, he turned his back, fumbled with his pants, and dropped the package to the ground. Laboratory tests confirmed that the package contained methamphetamine.

---

[1](...continued)
No. CR-97-40061-01 (D. Kan. Jan. 26, 1999). By separate Order and Judgment issued today, we also affirm Kiister's sentence in that matter.

This particular transaction was the culmination of contacts between Kiister, Autem, Denzil West, and Orvil and Carol Ritter. West testified at trial that Kiister, over the previous year, had repeatedly asked him for methamphetamine. Kiister had apparently learned of West's involvement in methamphetamine trafficking when West was arrested in 1996 on unrelated drug charges. West testified that Kiister repeatedly requested one pound of methamphetamine, telling him that if West could supply it, "he had a chance to get rid of some." R. Vol. 4 at 295. While West initially took no action on Kiister's requests, the two did discuss the price of one pound of methamphetamine.

Around April 21, 1997, West was approached by John Autem, who indicated his interest in getting several pounds of methamphetamine. In the course of a series of meetings and phone calls with Autem, West agreed to get four pounds of methamphetamine from his suppliers and to sell it to Autem. West testified that around April 26, 1997, he also called Kiister and told him that they needed to "get together" because they could "make some money." R. Vol. 4 at 298, 307. He also testified that he planned on "fronting" the methamphetamine to Kiister, [2] and that because of their previous conversations, Kiister "knew what we

_____

[2]The term "fronting," as used in the drug trade, refers to situations when a seller of drugs gives the drugs to a buyer on credit with the understanding that when the buyer resells the drugs to the customers, the proceeds of those sales are to be used to pay the supplier. See United States v. Mosley, 965 F.2d 906, 908
(continued...)

was [sic] talking about" despite the fact that neither drugs, money, nor any amounts were mentioned at that time. R. Vol. IV at 298.

The police knew about this transaction through Autem, who had been working as a confidential informant since his December 1996 arrest on drug and weapons charges. Autem told police that the transaction would take place at his farm on April 29, 1997. That day, West obtained four pounds of methamphetamine from his suppliers, Orvil and Carol Ritter, and drove to Autem's farm. The police were already present, and had set up video and audio surveillance equipment in the outbuilding near Autem's home. When West arrived at the outbuilding, he exchanged three pounds of methamphetamine for $45,000 provided to Autem by the government. West and Autem then agreed that Autem would inform Kiister, who lived nearby, that the load had arrived and that Kiister could come over to pick up his share. West then left to meet the Ritters and was arrested by police when he pulled into a nearby café. When the Ritters arrived at the café, they were also arrested.

At the direction of the police, Autem removed all but one pound of methamphetamine from the table in the outbuilding. He then called Kiister,

---

[2](...continued)
(10th Cir. 1992).

telling him that West was there and that Kiister should come over. When Kiister arrived, the previously described transaction was recorded on videotape and audiotape, and Kiister was arrested.

Following Kiister's arrest, officers obtained several warrants to search Kiister's home, rental properties, and vehicles. The lengthy warrant affidavit prepared by Detective Holsinger described the types of items law enforcement agents expect to find at the home of known drug traffickers, including drugs, plastic bags, scales, cutting agents, communication devices, large amounts of cash, records, receipts, and weapons. The affidavit then stated a multitude of reasons why the police concluded Kiister was currently dealing drugs, including: (1) statements from a confidential informant ("Informant 1") who said he/she had sold methamphetamine for Kiister during 1993 and 1994, (2) during a previous 1995 search for firearms, ammunition, and documents, the police had photographed a letter purportedly written by convicted drug dealer Michael Harshman that gave Kiister permission to collect money from persons owing Harshman for drug transactions, (3) statements from Harshman's girlfriend that Harshman told her he had purchased large quantities of methamphetamine from Kiister in 1996, (4) evidence that Kiister repeatedly telephoned other known drug dealers, including West and Harshman, (5) during a previous 1996 search for stolen property, officers discovered a receipt for a large quantity of iodine

crystals, which are sometimes used to manufacture methamphetamine, (6) a second confidential informant's ("Informant 2") 1997 statements that both he and Kiister had obtained methamphetamine from West several years ago, and that recently Kiister had told the informant that he had delivered iodine crystals to someone who would make methamphetamine, and (7) additional statements from Informant 2 that West and Kiister were still involved in drug transactions and were currently making plans for future drug transactions.

In executing these warrants on Kiister's property, the police seized an UZI 9 millimeter pistol with the serial number obliterated; ammunition; gunpowder; other various firearms equipment; a book entitled "Clear Your Record and Own a Gun"; an October 1995 bill of sale from Kiister purporting to transfer "[a]ll of my guns" to Jennifer Stevens for $1.00; a Ducks Unlimited auction ticket, dated September 1996, for a Browning BPS gun; a receipt from JR Enterprises for a November 1996 purchase of a Browning firearm; police scanners; scales; two receipts for iodine crystals; a telephone index and Rolodex cards containing West's name and telephone number; the previously photographed letter allegedly sent by Harshman; and receipts for substantial purchases made by Kiister between January 1, 1993, and the date of the search. [3] Subsequent searches of Kiister's

_____

[3]The police also seized a pair of night vision goggles. At trial, the court excluded this item.

vehicles produced numerous small plastic bags and a catalog from the company from which Kiister had purchased the iodine crystals.

On May 28, 1997, a federal grand jury indicted Kiister, West, and Orvil and Carol Ritter on a four-count indictment. Count 1 charged that the four defendants conspired to possess with the intent to distribute methamphetamine, in violation of 21 U.S.C. § 846. Count 2 charged West and the Ritters with possession with the intent to distribute one kilogram or more of methamphetamine, in violation of 21 U.S.C. § 841(a)(1) . Count 3 charged Kiister with possession with intent to distribute 100 grams or more of methamphetamine, also in violation of 21 U.S.C. § 841(a)(1), and Count 4 charged Kiister with being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g), 924(a)(2). West and the Ritters pleaded guilty to the charges, but Kiister maintained his innocence, contending he did not know the package he took from Autem contained methamphetamine.

Prior to trial, Kiister sought to have the evidence which was seized from his property and vehicles suppressed, arguing that the officer who had prepared the affidavit omitted key information that would have vitiated probable cause had it been included. Kiister also filed a motion in limine to prevent the introduction of evidence of any prior crimes or other bad acts Kiister may have committed. The district court denied both motions, electing to make individual evidentiary rulings during trial on the proffered evidence.

At trial, the government sought to introduce the evidence seized during the searches. The district court allowed all but one of these items. [4] At the conclusion of trial, the jury convicted Kiister on Count 1 for conspiracy to possess with intent to distribute methamphetamine and on Count 3 for possession with intent to distribute methamphetamine, but acquitted him on the firearm possession count. The court subsequently denied Kiister's Motion for Acquittal and Motion for New Trial and his Second Motion for New Trial. This appeal followed.

## I. Denial of Suppression Motion

In support of his contention that the police lacked probable cause to search his property in April 1997, Kiister argues that much of the information set forth in the affidavit was stale and failed to provide sufficient basis to believe that the items sought would be found in the places named in the warrants. Interwoven with this argument is his further contention that, in applying for the search warrant, police failed to inform the issuing judge that in their 1995 and 1996 searches of his property they did not see any drugs or tangible drug proceeds. Expanding that line of reasoning, Kiister also alleges that the search warrant affidavit omitted mention of two 1994 searches of his property, in which no drugs were found. Finally, he contends that the affidavit omitted "important facts"

---

[4]See supra note 3.

about the prior criminal history of Informant 2, whom Kiister alleges is John Autem. [5]  In sum, Kiister contends that considering the totality of the circumstances, there was no probable cause to support the search warrants and that, at the very least, he should have been granted an evidentiary hearing on the issue.

When reviewing a district court's denial of a motion to suppress, we accept the court's factual findings unless they are clearly erroneous, and consider the evidence in the light most favorable to the government.  See United States v. Flores , 149 F.3d 1272, 1277 (10th Cir. 1998),  cert. denied , 119 S. Ct. 849 (1999). "Keeping in mind that the ultimate burden is on the defendant to prove that the challenged seizure was illegal under the Fourth Amendment, the ultimate determination of reasonableness under the Fourth Amendment is a question of law reviewable de novo."  See United States v. Long  , 176 F.3d 1304, 1307 (10th Cir.), cert denied , 120 S. Ct. 283 (1999).  Additionally, we review the district court's denial of an evidentiary hearing for an abuse of discretion.  See United States v. Chavez-Marquez  , 66 F.3d 259, 261 (10th Cir. 1995).

---

[5]Four months prior to the affidavit's preparation, police discovered in Autem's home 300 pounds of marijuana, an undisclosed amount of methamphetamine, an unregistered machine gun, a silencer, various other weapons, and over $10,000 in cash.  See R. Vol 3 at 182-89.

The task of an issuing judge, in determining probable cause for search warrants, is "simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates , 462 U.S. 213, 238 (1983). The issuing judge is permitted to draw reasonable inferences from the affidavits, see United States v. Rowland , 145 F.3d 1194, 1205 (10th Cir. 1998), and may even rely on hearsay statements, provided they are sufficiently reliable, see Clanton v. Cooper , 129 F.3d 1147, 1155 (10th Cir. 1997).

*A. Allegedly Stale Information*

Kiister contends that information about his alleged drug trafficking during 1993 to 1996 was impermissibly stale and provided no probable cause that evidence of present drug trafficking would be found on his property. We disagree. While "[p]robable cause to search cannot be based on stale information that no longer suggests that the items sought will be found in the place to be searched," United States v. Snow , 919 F.2d 1458, 1459 (10th Cir. 1990), the question of whether the information in the affidavit is stale does not depend upon the time elapsed between the facts and the issuance of the warrant. Instead, we look to "the nature of the criminal activity, the length of the activity, and the

-10-

nature of the property to be seized." Id. at 1460 (quoting United States v. Shomo, 786 F.2d 981, 984 (10th Cir. 1986)). Where the affidavit describes ongoing and continuous criminal activity, the passage of time is less critical. See United States v. Pace, 981 F.2d 1123, 1133-34 (10th Cir. 1992).

In investigating Kiister's activities over several years, police gathered reliable information that Kiister was involved in ongoing and continuous methamphetamine distribution. The warrant affidavit recites that from 1994 until the date of the warrant, law enforcement officers received numerous tips from "informants and individuals prosecuted for drug-related offenses that Victor Kiister was selling, distributing, and delivering methamphetamine." R. Vol. I Doc. 60, Ex. 1 at 7. Informant 1 told police that he sold a substantial amount of methamphetamine for Kiister and that Kiister also sold methamphetamine to Eddie Taylor. Informant 2 told police that both he and Kiister had obtained methamphetamine from West for several years, that Kiister offered to front him methamphetamine, and that Kiister also supplied Eddie Taylor with methamphetamine. Taylor himself admitted buying methamphetamine from Kiister and from Harshman. Harshman admitted supplying methamphetamine to Taylor. Harshman's girlfriend told police that Harshman had bought large quantities of methamphetamine from Kiister. The letter found in Kiister's home indicated that Kiister and the author had drug dealings together; substantial

evidence indicated that the author was Harshman. Telephone records over this period reveal that Kiister was in frequent contact with West and with Harshman, even after Harshman's incarceration for drug trafficking. Most recently, Informant 2 told police that Kiister and West were still involved in drug trafficking and were currently making plans for future drug transactions.

These witness statements, all recited in the affidavit, reveal a web of methamphetamine distribution that continued up to the time of the affidavit. Though the witness statements were not highly detailed, their consistency indicates their probable accuracy. See United States v. Le, 173 F.3d 1258, 1266 (10th Cir. 1999) ("Consistency between the reports of two independent informants helps to validate both accounts.") (quoting United States v. Schaefer, 87 F.3d 562, 566 (1st Cir. 1996)). When presented with the information in the affidavit, a detached magistrate could reasonably conclude that Kiister was involved in an ongoing methamphetamine sales and distribution scheme. The information, therefore, was not impermissibly stale.

The affidavit thus provides probable cause that evidence of Kiister's drug trafficking would be found on his property. As we have frequently held, "courts often rely on the opinion of police officers as to where contraband may be kept." United States v. $149,442.43, 965 F.2d 868, 874 (10th Cir. 1992). Furthermore, "[w]here a suspect has no place of business separate from his residence, it is

-12-

reasonable for an officer to conclude that evidence may be at the suspect's residence." Id. The affidavit mentioned that previous searches of Kiister's home had produced a letter tying Kiister to a methamphetamine distribution scheme, financial records showing large bank deposits, and receipts for iodine crystals, which, as Detective Holsinger described, are often used in the manufacture of methamphetamine. In sum, we conclude that the affidavit, on its face, provided probable cause sufficient to support a search of Kiister's property for evidence of drug trafficking.

### B. Omitted Information and Evidentiary Hearing

Kiister argues, however, that any probable cause is vitiated by the information omitted from the affidavit. In Franks v. Delaware, the Supreme Court held that it is a violation of the Fourth Amendment for an arrest warrant affiant to "knowingly and intentionally, or with reckless disregard for the truth," include false statements in the affidavit. 438 U.S. 154, 155 (1978). We have held that the standards of "deliberate falsehood" and "reckless disregard" set forth in Franks apply "to material omissions, as well as affirmative falsehoods." Stewart v. Donges, 915 F.2d 572, 582 (10th Cir. 1990).

Under Franks and Stewart, an evidentiary hearing is required only when the defendant makes a substantial preliminary showing (1) that the affiant knowingly

or recklessly either included affirmatively false statements or omitted material facts, and (2) that the affidavit, with its necessary corrections, would not support probable cause. See Franks, 438 U.S. at 155-56; Stewart, 915 F.2d at 582-83. Where information has been omitted from an affidavit, we determine the existence of probable cause "by examining the affidavit as if the omitted information had been included and inquiring if the affidavit would still have given rise to probable cause for the warrant." Stewart, 915 F.2d at 582 n.13. If the information omitted is not material to the issuing judge's determination of probable cause, no evidentiary hearing is necessary.

Relying on Franks and Stewart, the district court found that Kiister had failed to make the required preliminary showing that the officers knowingly or recklessly omitted from the affidavits material information that would have vitiated probable cause. See Order (Sept. 5, 1997), R. Vol. I, Doc. 67 at 24. Accordingly, it denied Kiister's motion for an evidentiary hearing. We agree with the district court that the defendant failed to meet this preliminary burden.

It is undisputed that the previous searches were all conducted by the same sheriff's department, and that Detective Holsinger was the affiant on at least one of those previous searches. It is therefore a reasonable inference that, at the time he applied for the April 1997 warrant, Detective Holsinger was aware of the previous searches and their results. However, from the record we are unable to

-14-

say that his omission of this information demonstrated "reckless disregard for the truth."

Regardless, Kiister has not demonstrated that the omitted information would have vitiated probable cause had it been included in the affidavit. If the issuing judge "would not have altered his probable cause determination even if he had been presented with the omitted material, then the warrant should be upheld." United States v. Kennedy, 131 F.3d 1371, 1377 (10th Cir. 1997).

While the affidavit does not specifically state that prior searches of Kiister's property had produced no drugs, the affidavit clearly explains that neither the 1995 nor the 1996 warrants were issued for drugs. [6] According to the affidavit, the December 1995 warrant was issued for firearms, ammunition, and paperwork related to firearms transactions. In this 1995 search, police seized several firearms for which charges were brought against Kiister. [7] The December 1996 warrant was obtained to search for stolen tubs of animal feed and related paperwork. In executing this warrant, officers seized the stolen property and again brought charges against Kiister. The fact that the police, while executing warrants for guns and stolen property, did not discover drugs or indisputable

[6]Kiister does not explain the object of the two 1994 searches nor does he explain their relevance, other to suggest that neither search produced drugs.

[7]Thus, the fact that the police may have unsuccessfully employed a trained drug dog in the 1995 search for guns, as Kiister contends, see Appellant's Br. at 12, becomes less significant.

evidence of drug trafficking does not suggest that such evidence would not be found in a later search conducted specifically for that purpose.      [8]   More to the point, the information in the affidavit, as described above, overwhelmingly provided probable cause for the issuance of a warrant, even if the omitted material is included.

Kiister's last contention, that police knowingly omitted material facts of the criminal history of Informant 2, lacks merit.  Such information, had it been included in the affidavit, would not have vitiated probable cause.

In sum, we conclude that the district court did not err in denying Kiister's motion to suppress nor in denying him an evidentiary hearing.

## II.  Conspiracy

Kiister next argues that there was insufficient evidence to support his conspiracy conviction.  Count 1 of the indictment charged Kiister, West, and Orvil and Carol Ritter with conspiracy to "possess with the intent to distribute or dispense 1 kilogram or more of a mixture or substance containing a detectable amount of methamphetamine."  R. Vol. 1, Doc. 1 at 1.  Kiister argues that the

---

[8]Furthermore, a formal recitation of the results of the previous searches would have required the government to explain that, at least twice previously, the government had found precisely the contraband specified in the warrant applications: firearms in 1995 and stolen property in 1996.

evidence presented at trial does not support a finding that he was part of this conspiracy, but merely suggests that he agreed, on very uncertain terms, to purchase a single pound of methamphetamine. He further argues that his transaction was independent of the arrangements of the "true conspirators": West, Orvil and Carol Ritter. See Appellant's Br. at 22. Kiister suggests that West's testimony that he had never previously sold methamphetamine to Kiister and that the arrangement between them was simply that "there was a load coming" and that Kiister "was to get a pack," R. Vol. 4 at 308, demonstrates that Kiister was merely a "passive participant waiting for events out of his control or knowledge." Appellant's Br. at 22.

When reviewing the sufficiency of the evidence to support a jury verdict, we review the record de novo, viewing the evidence in the light most favorable to the government. See United States v. Beers, 189 F.3d 1297, 1301 (10th Cir. 1999). We will only overturn the verdict if no reasonable jury could find the defendant guilty beyond a reasonable doubt. See id. "To the extent that the evidence conflicts, we accept the jury's resolution of conflicting evidence and its assessment of the credibility of witnesses." United States v. Ivy, 83 F.3d 1266, 1284 (10th Cir. 1996) (quoting United States v. Sapp, 53 F.3d 1100, 1103 (10th Cir. 1995)).

"To obtain a conviction for conspiracy, the government must show [1] that two or more persons agreed to violate the law, [2] that the Defendant knew at least the essential objectives of the conspiracy, . . . [3] that the Defendant knowingly and voluntarily became a part of it, and [4] that the alleged coconspirators were interdependent."  Ivy, 83 F.3d at 1285 (alteration in original) (internal quotations omitted).  Kiister challenges the last of these elements, arguing that there was insufficient evidence for the jury to find that he and the four alleged coconspirators were interdependent.

"Interdependence exists if the alleged coconspirators were united in a common unlawful goal or purpose, and if a defendant's activities facilitated the endeavors of another alleged coconspirator or facilitated the venture as a whole." United States v. Ailsworth , 138 F.3d 843, 851 (10th Cir. 1998) (internal citations and quotations omitted).  In the context of a conspiracy to distribute illegal drugs, "[w]hat is needed is proof that [the coconspirators] intended to act together for their shared mutual benefit within the scope of the conspiracy." United States v. Evans, 970 F.2d 663, 671 (10th Cir. 1992).

"[W]here large quantities of drugs are being distributed through a key distributor, each major buyer may be presumed to know that he is part of a wide-ranging venture, the success of which depends on performance by others whose identity he may not even know." United States v. Edwards , 69 F.3d 419, 431

-18-

(10th Cir. 1995) (internal quotation marks omitted).  While proof of a buyer-seller relationship alone is not enough to tie the buyer to a larger conspiracy,          see Evans , 970 F.2d  at 673, "[e]vidence that an intermediate distributor bought from a supplier might be sufficient to link that buyer to a conspiracy to distribute drugs [where] both buyer and seller share the distribution objective."          Ivy , 83 F.3d at 1285.  Thus, "the purpose of the buyer-seller rule is to separate consumers, who do not plan to redistribute drugs for profit, from street-level, mid-level, and other distributors, who do intend to redistribute drugs for profit, thereby furthering the objective of the conspiracy."     Id. at 1285-86.

The government presented evidence that after learning of West's prior methamphetamine involvement, Kiister repeatedly asked him for one pound of methamphetamine.  West testified that Kiister indicated that he had a ready market for the drug if West could supply it.   [9]  The evidence suggests that the two agreed that when West obtained his next load, that Kiister would get one pound of it.  When West contacted Kiister to tell him that a load would be arriving soon, he

_____

[9]This case thus differs from our decision in United States v. McIntyre, 836 F.2d 467 (10th Cir. 1987), where we held that the government had failed to demonstrate that the defendant, a drug purchaser, shared in his seller's distribution objective.  In that case, we found "no indication that defendant was making a profit or distributing cocaine when he merely shared his purchases with his friends present at the time of sale."  Id. at 471.  Here, the evidence suggests that Kiister intended to resell methamphetamine for profit.

indicated to Kiister that they could both "make some money" on the transaction. R. Vol. 4 at 307. From the conversations between Autem, West, and Kiister, it is a reasonable inference that Kiister knew that he was one of two or more distributors West was supplying with this load. Thus, a reasonable jury could infer that Kiister understood that West and his unknown supplier planned to distribute several pounds of methamphetamine for profit, and that Kiister agreed to cooperate in achieving that object. As the district court stated in denying Kiister's motion to acquit, "[b]y leading West to believe that he would take part of the load and also by actually taking possession of his part, Kiister acted in furtherance of the conspiracy's objective and became a knowing participant." United States v. Kiister, No. CR-97-40036-02, slip op. at 8 (D. Kan. Feb. 12, 1998). Furthermore, "Kiister's retail market complimented West's wholesale market and was integral to the conspiracy's success." Id. at 10. Kiister depended upon West to provide the methamphetamine he planned to sell. West, in turn, obtained the methamphetamine from Orvil and Carol Ritter. Because West fronted the methamphetamine to Kiister, West's profit ultimately depended on Kiister's ability to sell it. [10]

---

[10]Kiister makes much of our decision in Edwards, in which we held that the codefendants' pooling of money to obtain a lower price for drugs was a factor indicating interdependence. See 69 F.3d at 431-32. He suggests that because there was no evidence of pooling of resources in the present case that the

(continued...)

-20-

In sum, there was substantial evidence on which a reasonable jury could find the interdependent element of the conspiracy charge, and the district court therefore did not err in denying Kiister's motion to acquit.

## III.  Prior Bad Acts Evidence

Finally, Kiister contends that the district court admitted evidence of his prior bad acts in violation of Federal Rules of Evidence 403 and 404(b), and that the admission of this prejudicial evidence denied him a fair trial.  Specifically, he complains that the district court erroneously admitted (1) testimony from Michael Harshman that Kiister sold drugs in 1994 and 1995, (2) testimony that Kiister spent $227,000 from 1993 to 1997, and that this money was unaccounted for and unexplained, (3) testimony that Kiister had at least two guns after he had been convicted of a felony, (4) testimony relating to receipts for iodine crystals seized from Kiister's property, (5) argument that Kiister's reputation was as a drug distributor, and (6) testimony early in the trial that Kiister's relationship with

[10](...continued)
government has failed to demonstrate that the coconspirators were interdependent. However, in Edwards we did not indicate that the pooling of funds was a prerequisite to a finding of interdependence; we merely listed that factor, among others, as evidence that the defendants in that case had relied upon each other for the success of the conspiracy.  Additionally, while the pooling of resources may indicate interdependence between several equal-level purchasers, the concept is less applicable in a vertical conspiracy such as this.

Autem was that "they were still doing the narcotics trafficking together." R. Vol. 3 at 28. The government contends that this evidence was admissible under Rule 404(b) to rebut Kiister's trial defense that his possession of the one pound of methamphetamine was not intentional, but was merely an accident or mistake.

We review the denial of a motion for a new trial for abuse of discretion. See Unit Drilling Co. v. Enron Oil & Gas Co., 108 F.3d 1186, 1193 (10th Cir. 1997). Because the issue of whether a new trial should be granted hinges on the admissibility of evidence, our determination will be governed by our review of the admission of the evidence for abuse of discretion. See United States v. Quintana, 70 F.3d 1167, 1170 (10th Cir. 1995).

Under Fed. R. Evid. 404(b), "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." However, it may "be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Id. As the district court noted,

> [i]ntent, knowledge, motive and absence of mistake were at issue in this trial. Kiister's defense at trial was that he was merely present at the crime scene, that he did not know the package in his possession contained methamphetamine, that he did not have any agreement with West to purchase methamphetamine, and that he had no intent to distribute methamphetamine. Plainly, these are proper purposes for introducing 404(b) evidence.

-22-

United States v. Kiister, No. CR-97-40036-02, slip op. at 8 (D. Kan. Feb. 12, 1998) at 13. We agree. The government's introduction of the evidence of Kiister's prior drug transactions and unexplained wealth was admissible under 404(b) to rebut Kiister's claim that he was ignorant of the contents of the package he possessed and that he had no motivation to buy or to sell drugs. We find no abuse of discretion in the admission of this evidence.

Similarly, evidence that Kiister possessed two firearms after he had been convicted of a felony was admitted to rebut Kiister's defense that the gun found in his house had been planted. The jury, however, acquitted Kiister of the charge of felony possession of a firearm. We agree with the district court that this verdict suggests the jury followed the court's limiting instruction and considered the evidence only for the purpose for which it was offered: to show Kiister's motive, plan, and intent to possess weapons in violation of the law. Therefore, we find no abuse of discretion in the admission of this evidence.

With respect to the receipts for iodine crystals found on Kiister's property, we note that Kiister raised no objection to the admission of the receipts themselves, even when Detective Holsinger testified that the receipts were seized because "iodine crystals is one of the main precursors . . . used to manufacture methamphetamine." R. Vol. 3 at 91-92. Detective Holsinger further explained: "One of the things that caught our attention about this was that he had ordered

such a large amount of the iodine crystals." <u>Id.</u> at 92. Kiister raised no objection until redirect, when Detective Holsinger was asked if he knew how much iodine would be used to treat a horse's hoof,[11] and then the objections raised were foundation and basis for knowledge. <u>See</u> R. Vol. 4 at 209-11. Kiister's failure to contemporaneously and specifically object to the evidence when it was presented limits our review to one for plain error, <u>see</u> <u>United States v. Mendoza-Salgado</u>, 964 F.2d 993, 1008 (10th Cir. 1992), of which we find none.[12]

Alternatively, even assuming for purposes of argument that the district court abused its discretion in admitting any or all of the contested evidence, any such error was harmless and provides no grounds for disturbing Kiister's conviction. <u>See</u> Fed. R. Crim. P. 52(a); <u>United States v. Cass</u>, 127 F.3d 1218, 1225 (10th Cir. 1997). An error in admitting evidence is considered harmless "unless a substantial right of [a] party is affected." Fed. R. Evid. 103(a). We have stated that an error affecting a substantial right of a party is an error which had a "'substantial influence' on the outcome or [which] leaves one in 'grave

---

[11]Kiister's trial testimony was that he used iodine crystals in treating animals' hooves.

[12]Kiister errs in his assertion that, because he filed a pre-trial motion in limine, he was not required to raise contemporaneous objections during trial. He fails to satisfy <u>United States v. Mejia-Alarcon</u>, 995 F.2d 982, 986-88 (10th Cir.1993), which relieves a party of making objections only when the court has issued a definitive ruling on the motion. Here, the district court specifically declined to make a definitive pre-trial ruling, electing instead to make individualized decisions throughout trial. <u>See</u> R. Vol. 3 at 10.

doubt' as to whether it had such effect." United States v. Rivera, 900 F.2d 1462, 1469 (10th Cir. 1990) (en banc) (quoting Kotteakos v. United States, 328 U.S. 750, 765 (1946)).[13]

The key items of evidence presented by the government—the testimony of West and the recorded conversations between Autem and Kiister—are not challenged on appeal. As discussed above, West testified that following his arrest on methamphetamine charges, Kiister spoke with him several times about having an available market if West could get some methamphetamine for him. West further testified that during one of these discussions, the two discussed the price for the methamphetamine. Kiister said that he wanted a pound of methamphetamine and the two agreed that when West received a load that he would contact Kiister about it. West testified that a few days prior to April 29, 1997, he contacted Kiister and told him that a load of several pounds would be arriving soon. This testimony is not evidence of any prior act but relates directly to the charged crimes.

The taped phone call between Autem and Kiister demonstrated that Kiister knew the reason why he should drive to Autem's house to meet with West. The

---

[13]When conducting our harmless error analysis, we review the record as a whole, see United States v. Charley, 189 F.3d 1251, 1270 (10th Cir. 1999), and the burden of proving that an error is harmless falls on the government, see Rivera, 900 F.2d at 1469 n.4.

audiotape and videotape of the conversation held between Kiister and Autem just prior to Kiister's arrest further illustrates that he was a knowing participant in the conspiracy to possess methamphetamine with the intent to distribute it and that he knowingly took possession of the methamphetamine for that purpose. Together, these taped conversations and West's testimony provided "compelling evidence that irrefutably contradicted Kiister's denial of knowledge and defense of innocent intent." United States v. Kiister, No. CR-97-40036-02, slip op. at 15 (D. Kan. Aug. 7, 1998).

Based on a review of the entire record, we conclude that the alleged errors did not have a substantial effect on the outcome.

## CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the district court.

ENTERED FOR THE COURT

Stephen H. Anderson
Circuit Judge